## LEE C. HAGGARD v. UNION DEPOT BRIDGE & TRANSIT RAILROAD COMPANY, Appellant.

### Division One, December 31, 1923.

1. **NEGLIGENCE: Collision of Cars: Duty of Street Railway Company.** One who employs servants in complex and dangerous business ought to prescribe rules sufficient for its orderly and safe management, and a street railway company is bound so to regulate the time and manner of running its cars as to avoid collisions between them, and to enable the servant operating a car to know when another on the same track may be expected and thus to avoid danger.

2. ———: ———: **Abandonment of Schedule: Question for Jury.** When the schedule for operating street cars is. departed from or abandoned it is the duty of the company to provide some other rule or system which will bring about a safe running of its cars. Where the only thing prescribed by the company for the government of its motormen in operating its cars was a schedule showing the time the cars left the barn and were to reach designated po'nts on their routes, and the evidence tends to show that in the circumstances attending the collision, which occurred before eight

o'clock on the morning of September 17th, this schedule never was, never could be, and never had been followed with any sort of regularity during the early morning hours, particularly in the fall and spring months when dense fogs were of frequent and usual occurrence, it is for the jury to decide whether the schedule had been abandoned with the company's knowledge and consent.

3. ———: ———: ———: **Established Substitute System of Running Street Cars.** The practice among the motormen of waiting and losing a trip when a car became ten minutes late, or so late as to get on the time of another car, is not sufficient precaution to absolve the company from liability for injury to a motorman resulting from the collision of two street cars, where (a) the practice was not always followed by the motormen, (b) was not established by the company or conclusively shown to have been sanctioned or enforced by it in such fashion as to give it character as a rule, and (c) the evidence does not conclusively show the colliding cars to have been ten minutes late, or on each other's time.

4. ———: ———: ———: ———: **Successful Operation.** Where the company had no system of operating its street cars, in the sense of rules or methods applicable to the existing conditions, either promulgated or sanctioned by it and supported by its authority, a contention that its system worked well for sometime before the collision of the cars, and therefore every inference of negligence was rebutted, assumes a fact put out of the case by a verdict authorized by the evidence.

5. ———: ———: ———: ———: **Adopted by Motormen: Not of Universal Application.** Though the practice adopted by the motormen of waiting and losing a trip when a car was ten minutes late, or so late as to get on the time of another, could be shown to have been so treated by the company as to be transmuted into a rule or system of operation, backed by the company's authority in such fashion as to become equivalent to its imposition by the company, yet that will not support a contention that every inference of negligence is thereby rebutted, even though it operated successfully for some time, where the practice was (a) not universal, (b) left the matter of losing a trip to the individual operator, or (c) did not apply in the circumstances existing at the time.

6. ———: ———: **In Dense Fogs: Agreement Among Motormen.** The practice of operating electric street cars, going in opposite directions on a single track, by agreement among the motormen as to passes, in dense fogs, snow and rains, when the track can be seen but a short distance and while belated cars are getting out of place in an effort to make up time, is so clearly dangerous as obviously to make the question of negligence one of common knowledge and experience; and though there is evidence that the prac-

Haggard v. Union Depot Bridge & Transit Railroad Co.

tice was adopted by the motormen, as a substitute for an unenforced and unenforcible schedule, yet if the evidence shows that it was not universal, that it left the matter of fixing the place of passing to individual operators, or that it did not apply to circumstances of the particular collision, no conclusive inference can be drawn that it was established by the company or received its sanction, or that the company's negligence was rebutted.

7. ———: ———: ———: **Contributory Negligence.** Where the evidence justifies a finding that no schedule applied or was applicable for operating street cars in dense fogs; the practice adopted by the motormen gave plaintiff the right of way at the point of collision; and the inference is justifiable that it was the absence of an established system, plus the insufficiency of this voluntary system, which the company failed to supplement or supplant with a reasonably-safe system, that caused the collision, he cannot be held guilty of contributory negligence as a matter of law.

8. **PLEADING:** Amendment: Continuance. An amendment to the petition to conform to the evidence, which makes no material changes in the issues, but leaves them in fact as they were before the amendment was made, does not entitle defendant to a continuance.

9. **VERDICT:** Second: Excessive: $13,000. The heavier car crushed the front end of the one driven by plaintiff; he was bedfast five weeks and used crutches two months. Thereafter as a sheet-metal worker's helper he was paid wages a little larger than he had received as motorman and conductor of the one-man car, but he still, more than two years after the injury, loses one or two days a week because of it. A blow across the back and hips broke off the transverse processes of the fourth and fifth lumbar vertebræ, and perhaps the third; the pelvic arch was slightly "tipped;" there was a cut back of the left ear, and numerous wounds on his legs, back and arms. Prior to the injury he was healthy, active, robust; he lost eighteen pounds, and is now very nervous and excitable; the injured region of the back continues painful, and interferes with his movements; he uses his hands in sitting down and arising, and turning in bed or stooping over gives pain; the left sciatic nerve is tender and painful, and he walks with a decided limp; his hearing in the left ear is impaired one-half or more, is getting worse, and the expert says it is practically destroyed; his memory is affected, his sleep is broken, and his kidneys give him pain. At a former trial, four months before this, the verdict was $12,000, and the same trial judge approved both verdicts, and the evidence shows that the judge and jury were more advantageously situated than is usual for passing upon the amount of damages to be awarded. *Held*, that the record does not make a case for interfering with a verdict for $13,000.

Appeal from Jackson Circuit Court.—*Hon. Allen C. Southern,* Judge.

AFFIRMED.

*Cyrus Crane* and *Kenneth McC. De Weese* for appellant.

(1) Plaintiff was guilty of contributory negligence as a matter of law and recovery should have been denied on this ground. Plaintiff violated the custom or rule requiring him to wait on the siding when late. That custom was equivalent to a formal rule. Rutledge v. Ry. Co., 123 Mo. 133. Said rule or custom had not been abrogated or set aside. Finnigan v. Ry. Co., 244 Mo. 631, 640. The violation of such a rule or custom defeats recovery. Flack v. Railway, 224 S. W. 415; McGahan v. Transit Co., 201 Mo. 508. (2) The submission of the case to the jury was erroneous. There was no evidence to warrant the submission attempted in plaintiff's Instruction 1. That instruction was fatally defective and contrary to well established principles of law. 3 Labatt on Master & Servant, pp. 2948, 2952. Negligence was improperly submitted. State v. Ellison, 272 Mo. 581. A system was shown to have been adopted and in use, and in the absence of evidence that it was insufficient, the question was not one for the jury. Yoakum v. Lusk, 232 S. W. 56; Railroad v. Bary, 84 Fed. 944; Central Railroad Co. v. Young, 800 Fed. 364. In the absence of either practical or expert showing that the rules were insufficient, the question is one of law for the court and not of fact for the jury. Railway v. Young, 200 Fed. 264; Railway v. Bary, 84 Fed. 944. The evidence was not sufficient to permit the jury to require that any specific rule be adopted. Gaska v. Car Fdry. Co., 127

Mo. App. 183. The law does not require that the defendant should notify its trainmen of the whereabouts of every train on the road. Railway v. Bary, 84 Fed. 944; Enright v. Toledo, 93 Mich. 409; Nolan v. Railroad, 70 Conn. 159; Reagan v. Ry. Co., 93 Mo. 348; H. & St. J. Ry. Co. v. Kanaley, 39 Kan. 1; Houston & Tex. Cen. Ry. v. Stewart, 92 Tex. 540. (3) The court erred in permitting the amendment of the petition, changing the cause of action, without granting defendant's request for a continuance thereafter. (4) The verdict was grossly excessive.

*Battle McCardle* for respondent.

(1) One who employs servants in a complex and dangerous business, such as a railroad, must pre-cribe and maintain rules and system for its safe and orderly management so as to prevent injury to employees. Reagan -. Railroad, 93 Mo. 348; Rutledge v. Railroad, 110 Mo. 312, 123 Mo. 121; Gaska v. Car & Foundry Co., 127 Mo. App. 169; Peppers v. St. Louis Glass Co., 165 Mo. App. 556. (2) The employer is not allowed to assume that each employee is capable of selecting upon each occasion that particular course of action which is safest for himself and passengers. Gaska v. Car & Foundry Co., 127 Mo. App. 169; 3 Labatt on Master & Servant, pp. 29, 47-51. (3) It is not enough to adopt a rule but the master must use care to insist on its observance. (4) Before plaintiff can be convicted of contributory negligence in disregarding a rule it must appear that the rule existed, that it was intended to apply to a situation shown in evidence, and that violation of it was the proximate cause of the injuries. The doubt will be resolved in favor of the employees. A disregarded rule is the same as no rule. Stuart v. Dickinson, 290 Mo. 516; San Pedro L. A. & S. F. Ry. Co. v. Brown, 258 Fed. 800; 3 Labatt, Master & Servant (2 Ed.) 1122. (5) If there be any conflict on the above points the issue is for the jury, and de-

fendant is concluded by the jury's finding. Brady v. Railroad, 206 Mo. 509; Barry v. Railroad, 98 Mo. 62; Francis v. Railroad, 127 Mo. 658; Adams v. Railroad, 199 S. W. 969; Yost v. Railroad, 245 Mo. 219; Hegberg v. Railroad, 164 Mo. App. 514; Dunlap v. Mallinckrodt Chem. Co., 159 Mo. App. 49. (6) The plaintiff is not required to designate the particular rule or system or means that defendant should have adopted to insure safe and ordinary running of its trains. The jury has the right under the evidence to say whether the master has performed his duty. Gaska v. Car & Foundry Co., 127 Mo. App. 169; Reagan v. Railroad, 93 Mo. 348; 3 Labatt on Master & Servant, 2947, 2951; Coast Ship Co. v. Yerger, 120 Miss. 152; H. T. & C. Railroad Co. v. Stewart, 92 Tex. 540. (7) Plaintiff is not guilty of contributory negligence when he does an act as all other employees do it. Shimp v. Stove Co., 173 Mo. App. 423.

JAMES T. BLAIR, J.—This is an appeal from a judgment for damages for injuries respondent received when one of appellant's street cars upon which he was acting as both motorman and conductor collided with another car.

The accident occurred in North Kansas City, which is on the north side of the Missouri River and separated from Kansas City by that stream. The terrain there is low and flat for more than a mile from the north bank of the river. In the fall and spring dense fogs are of frequent occurrence in these bottoms. North Kansas City is platted so as to correspond, in a measure, with the streets and avenues of Kansas City. The road or street which runs north from Kansas City across the Interurban bridge is called Grand Avenue. Along it are laid the double tracks of the K. C., C. C. & St. J. Railway, an electric line. Fourteenth Street, in North Kansas City, runs east and west, and crosses Grand Avenue at a point a quarter of a mile or more north of the Missouri River. Troost Avenue runs north and south, parallel to Grand Avenue, and is a half mile or more east of it. Armour

Road runs east from a point on Grand Avenue nearly a half mile north of Fourteenth Street, and crosses Troost Avenue, with a northing at that point of a few hundred feet—about one block. The fourth side of the trapezoid is that part of Grand Avenue between its intersection with Fourteenth Street and that with Armour Road. Grand Avenue and Troost Avenue are the parallel sides. Appellant operates its cars on tracks which lead out of Kansas City and across the bridge, then pass around the sides of the figure described. Double tracks are used on Grand Avenue and Fourteenth Street, and single tracks on Troost Avenue and Armour Road, except that tracks at Oak Street, a block east of Grand Avenue on Armour Road, could be used for purposes of passing cars. There was a passing place at the intersection of Troost Avenue and Armour Road. In addition, there was a switch on Armour Road which was occasionally used. The length of the run was between four and five miles, and what was called "the round trip" was twice that. Appellant's car-barns were situated near Grand Avenue and Armour Road. At the time respondent was injured five cars were operated by appellant. These were "one-man cars"; i. e., one man acted as both motor-man and conductor. Under the schedule in force the first car (on the morning of September 17, 1918, in charge of Haggard) left the car-barn at 5:35 or 5:38. The cars were "spaced" about twelve minutes apart. Conning-ton took out the second car. After the five cars in use began their runs, some of them began to run around the loop in one direction and some in another. The result of this was that they were required to pass each other on the trip around the loop, either on the double tracks or at the place or places provided for passing at points along the single-track part of the loop line. The evidence tends to show that, other than the schedule furnished, appellant had adopted no rule or system whereby the operator of one car could tell where the other cars were, except as he could see them as they approached or passed him. In daylight, in the absence of fog, snow, heavy

rains, and the like, the cars could be seen from one end of each leg of the loop to the other. In the fogs, which frequently covered the bottoms, cars could be seen but a short distance. These fogs would be very dense for a space, and then partial "breaks" would occur in them. At some places, in such fogs, cars would be visible but a few feet, and at others they could be seen for seventy-five or a hundred feet. On the morning and late-afternoon runs the traffic was heavy and quite frequently the men were not able to make the schedule. The presence of fogs had a like effect. The tracks were not so laid that vehicles, of which there does not seem to have been many, could pass along, across or over them very conveniently. The evidence tends to show that the men were frequently behind time on their runs. They adopted or fell into a practice of designating the car which first left the barn as the "leader" of the next car to leave, and of calling the second car the follower of the first, and so on. The evidence tends to show that these names were adhered to, though the "leader" and its "follower" soon began running around the loop in opposite directions. As a result of the cars almost customarily getting late in the mornings by reason of the early heavy traffic, fogs, etc., a practice arose whereby the operators of the cars, at least of a leader and its follower, would agree upon the point at which they would meet and pass each other. There was also a sort of practice or understanding among the men that when a car became so late that "it got on the other fellow's time," it would miss one trip and start in again. Some witnesses said this was done when a car got ten minutes late. The evidence tends to show this was not strictly followed. In operating on schedule, if on time or about on time, or under the agreements as to passing places when late, the follower would await the appearance of its leader before starting in on a single track. When his leader appeared that was understood to give a clearance to the follower to the next passing place, or to the agreed place of meeting, as the case might be. Appellant did not institute these prac-

tices and they were not invariably followed. They were devices of the men to take care of conditions which arose with much frequency, and had been followed, in the manner stated, for some time. If a car was late but not so late as to get on the time of another car, it strove to make up its time and avoid losing a trip. The average rate of speed was reduced about one-half in fogs, or to eight or ten miles per hour.

On the morning of September 17th, when respondent was injured, the fog was dense and the cars were all eight or ten minutes late. Respondent and Connington had agreed to pass at Armour and Oak, near Armour and Grand Avenue. Shore's car was late and was out of place. Respondent was completing his third trip. Shore left Fourteenth and Grand just ahead of respondent and proceeded east. Respondent followed on the same track. At Fourteenth and Troost, Phenix passed respondent. He went west on Fourteenth, and respondent went north on Troost. At Troost and Armour Road respondent turned west and started along the single track for Armour and Oak, the end of the double track just east of Grand Avenue, and the agreed meeting point with Connington. In the meantime Phenix had proceeded along Armour Road to Oak and passed Connington there, and had begun another trip south on Grand Avenue. He was late, as stated, and should have passed Armour and Oak before this. As soon as Phenix's car cleared, Connington moved out upon the single track and started along Armour Road for Troost Avenue. About a block west of Troost the collision occurred. The evidence tends to show that in the dense fog which enveloped him, Connington mistook Phenix's car for that of respondent. This meant to him that he had kept his agreement, and that his leader had come out of the single track and that he was entitled to go in upon it. This he did, with the result stated. Respondent says his car was moving eight or ten miles per hour when he first descried Connington's head light; that when he was first able to see it, it was ten or twelve feet away. Connington testified he

could see respondent's car some seventy-five feet away. According to both of them, they made every effort to stop, but did not accomplish it. The testimony is that there was no method, rule or system whereby one could tell where the other cars were on a morning like this when the cars got late.

The negligence alleged is the failure of appellant to prescribe rules, methods or system for the safe operation of the cars in the circumstances shown in this case. The answer is (1) a general denial, (2) a general plea of contributory negligence, and (3) plea of assumption of risk. The judgment is for $13,000. Other facts appear in the opinion.

I. It is urged that no negligence was shown. Appellant does not deny that "one who employs servants in complex and dangerous business ought to prescribe rules sufficient for its orderly and safe management" nor that "a railroad company is bound to regulate the time and manner of running its trains, so as to avoid collisions, and to enable all its servants to know when a train may be expected, and thus to avoid danger." [Reagan v. Railway, 93 Mo. l. c. 351, 352.] It contends (1) that "the evidence shows an established system;" (2) that the custom adopted is a part of appellant's system as a matter of law; (3) that the evidence shows the system worked successfully and was (4) sufficient.

*Duty of Company.*

(1) The only thing prescribed by appellant for the government of its employees in operating its cars was a schedule showing the time cars left the barn and were to reach designated points on their trips. The evidence tends to show that in the circumstances and conditions existing along the line this schedule neither was nor could be nor had been followed with any sort of regularity during the early morning hours, particularly in the fall and spring when dense fogs were of frequent or usual occurrence. So far as this case is concerned all the evidence shows

*Schedule of Cars: Abandonment.*

that the schedule was neither enforced nor enforceable
and fails to disclose any effort on appellant's part to
enforce it. It was at least open to the jury to find that
in the morning hours and foggy times, the schedule fur-
nished had been abandoned with appellant's knowledge
and assent, in so far as any question in this case is con-
cerned. [Yost v. Railroad, 245 Mo. l. c. 245, 246, and
cases cited; McNee v. Trolley Co., 170 Mass. 283.] When
a schedule is departed from or abandoned, it is the duty
of the company to provide some other rule or system
which will bring about the safe running of its cars.
[Lewis v. Seifert, 116 Pa. St. 628; 3 Labatt on Master
& Servant (2 Ed.) sec. 1123, p. 2971, et seq.] The ob-
jections to instruction one are answered by these con-
siderations.

(2) The practice of waiting and losing a trip when
a car became ten minutes late, or so late as to get on the
time of another car, is urged to have been a sufficient
precaution in the premises and enough to
absolve appellant from liability. In the first
place, the practice was not always followed by
the men. Second, the practice was not established by
appellant, and it is not, to say the least, conclusively
shown that appellant sanctioned or enforced it in such
fashion as to give it character as a rule prescribed by it.
Third, the cars are not conclusively shown to have been
ten minutes late, nor to have been on each other's time.
At least, this is true of respondent's and Connington's
cars.

*Established Substitute.*

(3) It is argued appellant's system worked success-
fully for sometime and, therefore, every inference of neg-
ligence was rebutted.

(a) If the jury found, as the evidence authorized
it to find, that appellant had no system in the sense of
rules or methods applicable under existing conditions
and either promulgated or sanctioned by
it and supported by its authority, then
this argument assumes a fact put out of
the case by the verdict and founds itself upon it.

*Assumption of Non-Existing Fact.*

(b)  Further, though the practice adopted by the men, and now brought forward by appellant, could be said to be shown to have been so treated by appellant as to be transmuted into a rule or system of operation backed by appellant's authority in such a way as was equivalent to its imposition by appellant, yet the practice was not universal, left the matter of losing a trip to the individual operator, and did not apply in the circumstances existing at the time.

(4)  The practice of operating cars, going in opposite directions on a single track, by agreement among the men as to passing places, in dense fogs, snow and heavy rains, when the track could be seen but a short distance, and while belated cars were getting out of place in efforts to make up time, is so clearly dangerous as obviously to "make the question one of common knowledge and experience." [3 Labatt, p. 2952.] Nor was this practice shown to have been established by appellant, nor is the inference of appellant's sanction of it a conclusive one.

II.  It is insisted respondent was guilty of contributory negligence as a matter of law. (1) The rule as to waiting on the siding and losing a trip was not, as pointed out, shown to be applicable to the situation, as a matter of law, and respondent's failure to wait does not conclusively bar recovery. (2) The evidence amply justified a finding that the schedule was neither applied nor applicable in conditions like those existing when the collision occurred. (3) The evidence tends strongly to show that no rule requiring cars to be operated "under control" in fogs, rain and snow, was prescribed by appellant. The practice established by the men gave respondent the right of way from Troost and Armour to Grand and Oak, and he cannot be said conclusively to be shown to have been contributorily negligent because he acted upon it. It was a justifiable inference that it was the absence of established system, plus the insufficiency of this volun-

*Contributory Negligence.*

tary practice, which appellant failed to make any effort to supplement or supplant with a reasonably safe system, which caused the collision.

III.   Leave to amend to conform to the evidence was given.   An application for a continuance on this ground was denied.   The point is argued.   The petition had described the practice in use as requiring west-bound cars to "meet and pass cars coming from the west either at Oak Street or at Troost Avenue" and Armour Road; "and that a car bound west should wait at Troost Avenue for the east-bound car, and then proceed west and have the right of way along said single track until Oak Street was reached, where another east-bound car should be met and passed."   The amendment permitted changed this, so one passing place, under the practice, was alleged to be at Fourteenth and Troost and not at Troost and Armour.   The car for which respondent was required to wait was his "leader" and it passed him at Fourteenth and Troost.   There was no collision between these cars. Respondent was Connington's leader, and Connington should have awaited him at Armour and Oak.   It made no difference, in this case, whether the car whose passing gave respondent the right of way to Armour and Oak was to pass him, under the practice, or did pass him in fact, at Fourteenth and Troost, or at Armour and Troost.   The effect was the same, in either event.   It was Connington's failure to wait at Armour and Oak which caused the trouble and not the passing of respondent by his leader at this or that point; and it was a reasonable inference that Connington's error was due to the absence of a reasonable system for operating in fogs.

*Amending Petition: Continuance.*

IV.   The objections to the argument of counsel were sustained and no further action was requested.   The record does not furnish a basis for the complaint now made.

*Argument to Jury.*

V.   It is argued that the verdict was excessive.   In the collision the heavier car, operated by Connington,

crushed the front of respondent's car. Respondent was **Excessive.** confined to his bed for five weeks and used **Verdict.** crutches for nearly two months thereafter. He then went to work as sheet-metal worker's helper and has been receiving wages a little larger than those paid him by appellant. He still loses one or two days a week because of his injuries. The evidence tends to show that he suffered a blow across the back and hips which broke off the transverse processes of the fourth and fifth lumbar vertebrae, and perhaps of the third; the pelvic arch was "slightly tipped;" he suffered a wound about an inch deep and the "size of a nickle or quarter" on the outside of the upper left leg; a blow and cut back of the left ear; a cut across the elbow; there was a bruise across his back, and his hands and wrists were scratched and bruised. The evidence shows respondent was a healthy, active and robust man prior to the injury. He has lost eighteen pounds, and has become very nervous and excitable. The injured region of the back continues painful and interferes with his movements. He uses his hands in sitting down and arising, and turning in bed or stooping over gives him pain. The left sciatic nerve is quite tender and painful, and he walks with a decided limp. His hearing in the left ear is impaired one-half or more and is getting worse. One expert says it is practically destroyed. His kidneys were affected and give him pain and some incontinence of urine has resulted. His memory has been affected. His sleep is broken and is not restful. He is unable to do any heavy lifting, and his brother-in-law, who employed him for the milling company, has had to take him off of work requiring heavy lifting. He moves slowly, contrary to his previous habit.

This is the second verdict. The first was for $12,000 and was returned about four months before the trial under review. These trials occurred more than two years after respondent was injured, and the evidence was quite full on the questions concerning the character and extent

and results of his hurts.  This evidence shows conditions in the judging of which the trial judge and the jury had more than the usual advantage over this court in passing upon the amount of damages to be awarded. Two juries have practically agreed on that amount.  The new trial was granted after the first verdict on the ground that incompetent evidence had been admitted. The trial judge, therefore, has approved both verdicts, in so far as damages allowed is concerned.  In the circumstances the record does not make a case proper for intervention on that question.  The judgment is affirmed. All concur.